UNITED STATES *v.* HAWLEY & LETZERICH (No. 3068)[1]

United States Court of Customs and Patent Appeals, June 12, 1929

*Charles D. Lawrence,* Assistant Attorney General (*Marcus Higginbotham* and *Oscar Igstaedter,* special attorneys, of counsel), for the United States.

*Wm. E. Russell, amicus curiæ.*

No appearance for appellee.

[Oral argument October 4, 1928, by Mr. Igstaedter and Mr. Russell; reargued April 3, 1929, by the same parties]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The collector of customs at the port of Galveston charged $11.80 for inspector's services for overtime while the steamship *Huguenot*

[1] T. D. 43452.

was unlading a cargo of creosote oil in bulk at Galveston. Appellees, Hawley & Letzerich, protested the charge and on the protest styled themselves "Hawley & Letzerich, customs brokers and forwarders." The protest is in the following language:

R. W. Humphreys, Esq.,
    *Collector of Customs, Galveston, Tex.*

Sir: In re S. S. *Huguenot*, arrived Galveston September 18, 1926, with creosote oil in bulk, discharged at Pier 33 during the day and part of the night of September 18/19th, we paid for inspector's services for overtime and at night covering the discharge of this cargo through a pipe line $11.80.

Under the authority contained in the Tariff Act of 1922, section 514, we hereby beg to protest against the assessment of overtime for night or Sunday work upon a cargo of this kind discharged in the way in which this cargo was discharged.

Entry was promptly made for this cargo as being free of duty under paragraph 1549 of the said tariff act.

Said entry was accepted, and we understand the entry has been tentatively liquidated by you as being free of duty.

In T. D. 36330, question 151/2–160, the department held as follows:

"The department is of the opinion that a customs inspector should not be assigned to the unlading of a vessel at night when no inspector is assigned to such vessel by day, and that in general the discharge of free cargo in bulk should be under the supervision of the district inspector, with no charge for unlading at night."

If it should be held by you that this decision of the Secretary does not apply to creosote oil because that is not unconditionally free, but only conditionally free, we answer that all the purposes of the Government for the collection of revenue on such a cargo, if revenue was due, would be served by the withdrawal of samples of the cargo on arrival or during the hours of a customs day after discharge had been begun, and that no benefit accrues to the Government, either from a revenue view or any other view, or to the ship by causing an inspector to attend the vessel during discharge, when all that can be seen to connect the vessel or her cargo with the shore is a flexible rubber hose attached by bolts to the mouth of an iron pipe projecting slightly above the deck of the vessel, which rubber hose connects at the shore end with the mouth of an iron pipe, which, within a few feet thereof, disappears into the ground, so that none of the cargo which has come from the bowels of the ship is exposed to the human eye, and the only way in which could be told that creosote oil or anything else was flowing through the pipe just named was the slight oscillation of the flexible rubber hose, the sound of the ship's pumps, and by sounding with a lead and a line either the tanks of the ship, from which the creosote oil was being withdrawn, or by proceeding a mile or two away to the shore tanks into which the creosote oil was being discharged through the underground pipe and periodically sounding those tanks in order to find whether fluid was flowing in or out of them.

We maintain that this case is on all fours with the cases the subject of T. D. 36330, *supra*, and ask that the amount collected as overtime be refunded.

Case to be put upon Galveston docket; notice to us.

    Respectfully,

                    Hawley & Letzerich.
                    H.

The protest was forwarded to the United States Customs Court where the case was tried, apparently on the sole question as to whether or not the collector was justified, under Treasury regulations and

under the law, in collecting said charges for inspector's services in unlading a cargo which, protestants claimed, was free of duty, and which unlading did not require the services of a customs inspector. A majority of the third division of the court below, one justice dissenting, held that it did not "appear that there was any necessity for assigning an inspector overtime, or that one was actually assigned," and that the charge was an unnecessary one and a burden upon the importer, and sustained the protest.

The Government has appealed from the decision of the court below and here contends that under sections 450 and 451 of the Tariff Act of 1922 no distinction was made between dutiable and nondutiable merchandise for the purpose of inspector's charges, and further argues that there is a presumption in law that the sworn officers of the Government performed their respective duties and that all statutory regulations and requirements were complied with. The main burden of the argument of the Government before us, however, is, to our way of thinking, directed to a far more important and perplexing question, to wit, that the court below and this court have no jurisdiction to decide the case, in so far as sections 450, 451, and 514 of the Tariff Act of 1922, when considered in connection with section 5 of the act of February 11, 1913, as amended by the act of February 7, 1920, and section 308 of title 28 of the Code of Laws of the United States, show that Congress did not intend to confer upon the lower court or upon this court jurisdiction in cases like the one at bar.

The appellees have filed no brief and their contentions as to the law, as far as we are advised, are to be found in the protest set out above, and this, of course, is of no assistance in determining the jurisdictional question at hand.

William E. Russell, as *amicus curiæ*, was granted leave to file and did file, on behalf of the National Association of United States Customs Inspectors, a very well-prepared brief in which he states that the organization which he represents is composed of customs inspectors located in the various ports of entry in the United States. His position as to the law of the case is substantially the same as that of the Government. He has urged with much plausibility that the United States Customs Court is without jurisdiction to hear protests involving the collection of overtime pay for night services of customs officers, unless it is accorded to it under sections 514 and 515 of the Tariff Act of 1922, where provision is made for it to try controversies arising from "*all decisions of the collector, including the legality of all orders and findings entering into the same, as to the rate and amount of duties chargeable, and as to all exactions of whatever character*," and that the charges in the instant case, under the decisions of this and other courts, are not such an exaction as is provided for in section 514, *supra*. He argues further that, under the decisions of this and other courts, the statute providing for appeals to this court,

which limits our jurisdiction to "*final decisions by the Board of General Appraisers in all cases as to the construction of the law and the facts respecting the classification of merchandise and the rate of duty imposed thereon under such classification, and the fees and charges connected therewith,*" does not warrant us in taking jurisdiction of an appeal involving the legality of the charges of the collector for overtime pay for inspector's services.

The existing law governing the unlading of vessels at night, on Sundays, or holidays, is to be found in sections 450 and 451 of the Tariff Act of 1922 and section 5 of the act of February 5, 1911, as amended, and follows:

SEC. 450. SAME—SUNDAYS AND HOLIDAYS.—No merchandise, baggage, or passengers arriving in the United States from any foreign port or place, and no bonded merchandise or baggage being transported from one port to another, shall be unladen from the carrying vessel or vehicle on Sunday, a holiday, or at night, except under special license granted by the collector under such regulations as the Secretary of the Treasury may prescribe.

SEC. 451. SAME—BOND.—Before any such special license to unlade shall be granted, the master, owner, or agent, of such vessel or vehicle shall be required to give a bond in a penal sum to be fixed by the collector conditioned to indemnify the United States for any loss or liability which might occur or be occasioned by reason of the granting of such special license and to pay the compensation and expenses of the customs officers and employees whose services are required in connection with such unlading at night or on Sunday or a holiday in accordance with the provisions of section 5 of the Act entitled "An Act to provide for the lading or unlading of vessels at night, the preliminary entry of vessels, and for other purposes," approved February 13, 1911, as amended. In lieu of such bond the owner, or agent, of any vessel or vehicle or line of vessels or vehicles may execute a bond in a penal sum to be fixed by the Secretary of the Treasury to cover and include the issuance of special licenses for the unlading of vessels or vehicles belonging to such line for a period of one year from the date thereof.

SEC. 5 (supra). That the Secretary of the Treasury shall fix a reasonable rate of extra compensation for overtime services of inspectors, storekeepers, weighers, and other customs officers and employees who may be required to remain on duty between the hours of five o'clock postmeridian and eight o'clock antemeridian, or on Sundays or holdiays, to perform services in connection with the lading or unlading of cargo, or the lading of cargo or merchandise for transportation in bond or for exportation in bond or for exportation with benefit of drawback, or in connection with the receiving or delivery of cargo on or from the wharf, or in connection with the unlading, receiving, or examination of passengers' baggage, such rates to be fixed on the basis of one-half day's additional pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond five o'clock postmeridian (but hot to exceed two and one-half days' pay for the full period from five o'clock postmeridian to eight o'clock antemeridian), and two additional days' pay for Sunday or holiday duty. The said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel or other conveyance whenever such special license or permit for immediate lading or unlading or for lading or unlading at night or on Sundays or holidays shall be granted to the collector of customs, who shall pay the same to the several customs officers and employees entitled thereto according to the rates fixed therefor by the Secretary of the Treasury: *Provided,* That such extra

compensation shall be paid if such officers or employees have been ordered to report for duty and have so reported, whether the actual lading, unlading, receiving, delivery, or examination takes place or not. Customs officers acting as boarding officers and any customs officer who may be designated for that purpose by the collector of customs are hereby authorized to administer the oath or affirmation herein provided for, and such boarding officers shall be allowed extra compensation for services in boarding vessels at night or on Sundays or holidays at the rates prescribed by the Secretary of the Treasury as herein provided, the said extra compensation to be paid by the master, owner, agent, or consignee of such vessel: *Provided further*, That in those ports where customary working hours are other than those hereinabove mentioned, the collector of customs is vested with authority to regulate the hours of customs employees so as to agree with prevailing working hours in said ports, but nothing contained in this proviso shall be construed in any manner to affect or alter the length of a working day for customs employees or the overtime pay herein fixed.

Approved, February 7, 1920.

It will be noted that the three sections of the law quoted provide for certain regulations to be made by the Secretary of the Treasury. Both the Government and *amicus curiæ* have laid great stress upon the fact that in conformity with these statutory provisions the Secretary of the Treasury has made certain rules and regulations, not only for the granting of license, the fixing of bond, charges, etc., but has provided, in article 134 of the Customs Regulations of 1923, that "Protests against the exaction of extra compensation should be forwarded by collectors to the Secretary of the Treasury," and have emphasized the fact that under the ruling of the Comptroller of the Treasury under date of September 5, 1911, such overtime moneys are not moneys that are taken directly into the Treasury of the United States, but are moneys held by the collector for a special purpose, in a special deposit account. See T. D. 38048.

It is, in a sense, the position of *amicus curiæ* that since the Treasury Department is authorized to make the rules and regulations governing the collection of overtime pay, any protest filed against such charges should, in accordance with such regulations, be forwarded to the Secretary of the Treasury and not to the United States Customs Court, and that if his acts are not in conformity with law, redress must be sought in the Supreme Court of the District of Columbia. The cases of *Mellon* v. *Minneapolis, St. Paul & Sault Sainte Marie Railway Co.*, 285 Fed. 980, and *Mellon* v. *Minneapolis, St. Paul & Sault Sainte Marie Railway Co.*, 11 Fed. [2d] 332, and *Mellon* v. *New York Central Railroad Co. et al.*, 11 Fed. [2d] 335, *certiorari* denied, 271 U. S. 678, are cited in the briefs before us. It is not claimed that they are directly in point or controlling in the case at bar, but they are cited for the purpose of supporting the contention that the Supreme Court of the District of Columbia would have jurisdiction to correct errors of law on the part of the Secretary of the Treasury with reference to inspector's overtime charges for unlading cargo from vessels.

From the very meager record, the following facts appear:

The steamship *Huguenot* arrived at Galveston on September 18, 1926, with creosote oil in bulk and the same was discharged at Pier 33 during the day and part of the night of September 18 and 19, and the protestants paid a charge of $11.80 for inspector's services for overtime. It is customary to take a composite sample, which is made up of a small amount of oil from each tank, and submit the same to the Government chemist for analysis. The sample is drawn by a sampler from the appraiser's office at the port where the cargo is unladen and the same is taken at the time of arrival or at the time of discharge. The manner of unlading creosote oil, according to the testimony, would seem to be similar to discharging a cargo of crude oil from a steamer into a tank car or into a tank. Such a process involves the connection of a flexible hose of rubber or metal to a pipe in the tank of the vessel which is connected by a pipe to a container on shore. Sometimes the pipe from the ship connects to an underground pipe running far away from the vessel to large tanks located on the shore. The motive power for the pumps is sometimes furnished from the land and sometimes from the ship containing the oil. To determine whether the pumps are working and the oil discharging from the vessel, pressure gauges are examined, and observations are made of the flexible rubber connections, and soundings are made of the tanks on the ship and on the shore.

The assistant collector of customs at Galveston testified that the responsibility for the safety of the revenue in his district was strictly imposed upon the collector and that he did not think the safety of the revenue would be well protected without the assignment of an inspector for the discharging of a vessel containing a bulk cargo of creosote oil, even though it was later found to be free of duty; that it was part of his duty to examine merchandise imported at Galveston which consisted of cargoes of crude oil imported from Mexico and that there were many such cargoes unladen at Galveston and had been for the last five or six years; that it was his duty to examine and appraise creosote oil brought to Galveston from Europe in tank steamers which carry the oil in bulk. He further testified:

The particular practice of assigning special inspectors to creosote cargoes is based, in the collector's judgment, on the safety of the revenue involved. In such cargoes creosote oil is not absolutely free of duty. The free entry of creosote is contingent upon the chemical test of the particular cargo. There have been cases where chemical tests revealed creosote merchandise, entered as creosote free of duty, to be dutiable, and the practice in this district has been, on account of the necessity for the chemical determination, to place an inspector in charge in order that the collector's office will be in shape to protect the Government in any contingency as a result of the discharge of that cargo, and the practice in this district has been crystallized in connection with discharging creosote vessels to assign an inspector to the particular vessel for the entire time during which the vessel is discharging such cargo

The decision of a majority of the court below, sustaining the protest, was based upon the fact that it did "not appear that there was any necessity for assigning an inspector overtime, or that there was any actually assigned." The court further said: "We find that the charge of $11.80 is an unnecessary charge and burden on the importer."

The question of jurisdiction and several other important and interesting questions were not raised until the case reached this court. It is unfortunate that the record was not made with a view of presenting to the court below and here the several interesting questions which we are asked to decide.

It has been pointed out here that section 514 of the Tariff Act of 1922, relating to protests, authorizes a protest by "the importer, consignee, or agent of the person paying such charge or exaction," and that section 5, *supra*, provides that "the said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel," etc. It is suggested that the permit for unlading could only be granted to the "master, owner, agent, or consignee of such vessel," that under the statute the charges could be made against no one but the "master, owner, agent, or consignee of such vessel," and that there is no provision in any cited statute which authorizes a protest by the "master, owner, agent, or consignee of such vessel." It has been further suggested that the "agent of the person paying such charge or exaction" could not refer to the "master, owner, agent, or consignee of such vessel," since it is improbable that Congress would give the right to protest to an agent without extending the same right to the principal.

Hawley & Letzerich are the appellees and the protestants. They state that they are customs brokers and forwarders. Mr. Harry Hawley was attorney for appellees at the hearing at Galveston, Tex. The entry was made by Hawley & Letzerich, which entry states that the goods were imported by them. The invoice discloses that the seller or shipper of the merchandise was Bermuth Lembcke Co. (Inc.) who purchased it from the Creosoot Export Maatschappij and shipped same to Bermuth Lembcke Co. of New York and London.

It is not shown in this record that any charge or exaction was made against the "master, owner, agent, or consignee of such vessel," who, under the provisions of section 5, *supra*, is required to pay the same. From this record we are unable to determine in what capacity Hawley & Letzerich acted or to determine against whom the charge or exaction was made. If the charge was made against them as importers, the statute was not complied with and the charge would be unwarranted. In that instance, the importers would have the right to protest the unauthorized charge against them. Since the record fails to disclose against whom the charge was made, we hold that there was no right in Hawley & Letzerich to protest, and the protest

should have been dismissed. The mere fact that the record shows that appellees paid and protested the charge does not show that the charge or exaction was made against them.

We are not inclined to agree with the viewpoint of the court below that a charge for overtime inspector's services in connection with the kind of cargo herein involved is invalid, but, on this record, we do not care to discuss the question further. We regret that the state of the record prevents a full consideration of the interesting questions sought to be raised here, but we hope, by pointing out the deficiencies of the record, that the questions may be raised in a later case in a more satisfactory manner.

The judgment to the United States Customs Court is *reversed* and the cause *remanded* for further proceedings not inconsistent with the views herein expressed.